[Cite as *Purdon v. Ohio Dept. of Rehab. & Corr.*, 2011-Ohio-3877.]



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

JASON PURDON

      Plaintiff

      v.

OHIO DEPARTMENT OF REHABILITATION AND CORRECTION, et al.

      Defendants

Case No. 2009-02812

Judge Alan C. Travis
Magistrate Matthew C. Rambo

MAGISTRATE DECISION

{¶ 1} Plaintiff brought this action alleging medical negligence. The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶ 2} At all times relevant, plaintiff was an inmate in the custody and control of defendant Department of Rehabilitation and Correction (DRC) at defendant Pickaway Correctional Institution (PCI) pursuant to R.C. 5120.16. On January 25, 2006, plaintiff had his "upper left wisdom tooth" extracted by a dentist at PCI. Plaintiff testified that he was not aware of any problems with the procedure, but that he experienced significant swelling in his cheek and a "funny taste" in his mouth shortly afterward. According to plaintiff, on January 28, 2006[1], he filled out a form requesting to be seen in the PCI infirmary regarding the swelling in his cheek. Plaintiff stated that he went to the infirmary the next day, even though he did not have a scheduled appointment, and that a nurse examined him and gave him ibuprofen, but that she did not note the visit in his

---

[1]The court takes judicial notice pursuant to Evid.R. 201 that January 28, 2006, was a Saturday.

medical record.  According to plaintiff, he returned the following day because he had a golf ball-size lump in his left cheek, could not chew or open his mouth all the way, and was in severe pain.  Plaintiff stated that Nurse Muhammad gave him more ibuprofen and said she would notify the dentist and the doctor.  Plaintiff testified that the next morning, he was released from his work assignment in the PCI kitchen to go to the infirmary yet again.  According to plaintiff, he again saw Nurse Muhammad, and she told him to return at 1:00 p.m. to see the doctor.  Plaintiff stated that at this time, the lump had doubled in size, he was in excruciating pain, and he felt hot and feverish.  Plaintiff testified that he returned to his cell and waited until 1:00 p.m., when a corrections lieutenant escorted him to the infirmary.  According to plaintiff, after a brief examination, the doctor called an ambulance and plaintiff was transported to The Ohio State University Medical Center (OSUMC).

{¶ 3} Plaintiff testified that when he arrived at OSUMC he was given morphine for pain and eventually underwent surgery to the left side of his face.  According to plaintiff, two or three days after the initial surgery, he started to experience vision problems in his left eye. Plaintiff subsequently underwent additional surgeries to remedy the problems with his vision, but plaintiff eventually lost sight in his left eye.  Plaintiff asserts that the delay of three days between the time he submitted a request to go to the infirmary and the date when he was examined by a physician, combined with the delay of several hours between the time he first presented at the PCI infirmary with swelling to the time when he was examined by a doctor caused the blindness in his left eye.

{¶ 4} Tobbi Reeves-Valentine, a registered nurse and the current Medical Operations Manager and Healthcare Administrator for PCI, reviewed plaintiff's medical records in preparation for her trial testimony.  (Joint Exhibit A.)  Reeves-Valentine testified that in 2006, nursing care was available to inmates at PCI 24 hours per day, seven days per week, and that a physician was available in the institution 12 hours per day, and was "on call" at all times.  With regard to inmate access to medical services at

PCI, Reeves-Valentine stated that there are two methods that inmates may pursue: 1) submit a Health Services Request form or "kite" requesting medical care, or, if it is an emergency, 2) approach a member of the PCI staff and request to be taken to the infirmary. Reeves-Valentine stated that in an emergency, the staff member is obliged to contact the infirmary and then escort the inmate to the infirmary.

{¶ 5} Reeves-Valentine testified that plaintiff's medical record contains a Health Services Request form that plaintiff submitted stating his concern regarding a possible infection from the wisdom tooth extraction. The document shows that plaintiff dated the form January 28, 2006, and that it was received and reviewed by a nurse on January 31, 2006. According to Reeves-Valentine, inmates submit Health Services Request forms by placing them in one of three specified boxes, two of which are in the PCI dining hall and the other in the Fraser Health Center at PCI. Reeves-Valentine testified that during the time in question, the forms were collected and reviewed twice per day, at approximately 7:30 a.m. and 2:30 p.m. Reeves-Valentine stated that based upon the review date, the form submitted by plaintiff was either collected on the afternoon of January 30, 2006, or on the morning of January 31, 2006. With regard to plaintiff dating the document January 28, 2006, Reeves-Valentine stated that it is not uncommon for inmates to date documents incorrectly, or to fill them out one day and submit them at a later date.

{¶ 6} Reeves-Valentine testified that the interdisciplinary notes from plaintiff's medical record show that he presented to the PCI infirmary at approximately 2:30 a.m. on January 31, 2006, complaining of swelling and pain, and that he was then examined by Nurse Muhammad, who contacted the doctor on call. The doctor prescribed ibuprofen and plaintiff was scheduled to the see the doctor that afternoon. The record also shows that plaintiff returned to the infirmary and was again examined by Muhammad at approximately 7:15 a.m., whereupon Muhammad noted swelling on the left side of plaintiff's face that appeared larger than it had at his first visit, and that plaintiff was told to return at 12:30 p.m. to see the doctor. The record reflects that

plaintiff was examined by the doctor at 1:30 p.m. on January 31, 2006, and transported to OSUMC later that day.  (Joint Exhibit A.)

{¶ 7} Based upon the foregoing, the court finds that plaintiff's testimony as to when he submitted a request for medical treatment and when he visited the PCI infirmary to be misleading and unreliable.  The medical records establish that plaintiff had a tooth extracted on January 25, 2006, but that he was not seen again by defendant's medical staff until approximately 2:30 a.m. on January 31, 2006.  Inasmuch as there is no documentary evidence to establish that plaintiff presented to any PCI staff with medical concerns at any time between those dates, the court finds that there was no unreasonable "delay" in medical treatment that can be attributed to defendant.

{¶ 8} In order to prevail on a claim of medical malpractice or professional negligence, plaintiff must prove:  1) the standard of care recognized by the medical community; 2) the failure of defendant to meet the requisite standard of care; and 3) a direct causal connection between the medically negligent act and the injury sustained. *Wheeler v. Wise* (1999), 133 Ohio App.3d 564; *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127.  The appropriate standard of care must be proven by expert testimony.  *Bruni,* at 130.  That expert testimony must explain what a medical professional of ordinary skill, care, and diligence in the same medical specialty would do in similar circumstances.  Id.

{¶ 9} Plaintiff presented the testimony of Gary Wilson, M.D. in support of his claim.  Wilson testified that he spends at least 75% of his time in the active treatment of patients, that he specializes in infectious diseases and critical care medicine, and that he has dealt with infections resulting from tooth extractions.  Wilson reviewed plaintiff's medical records from both PCI and OSUMC in preparation for trial.  Wilson testified that after plaintiff arrived at OSUMC he underwent several surgeries to the left side of his face.  (Joint Exhibit A, B.)  According to Wilson, the initial surgery was to "debride" or surgically remove dead and infected tissue from the left side of plaintiff's face and jaw.  Wilson stated that the records show that plaintiff underwent a second surgical

procedure two days later after he developed vision problems in his left eye. Wilson testified that the records show plaintiff was suffering from a retrobulbar hemorrhage, or bleeding, behind the left eye that ultimately resulted in plaintiff losing sight in that eye. According to Wilson, the records also show that pus was drained from behind plaintiff's eye during that operation, which is an indication of infection. Wilson stated that, in his opinion, the infection caused the blindness in plaintiff's left eye.

{¶ 10} Wilson further opined that the infection progressed to the point where it caused plaintiff's blindness as a result of defendant's unreasonable delay in providing treatment. Wilson stated that the first delay occurred when defendant did not treat plaintiff on January 28, 2006, after he had allegedly submitted a Health Services Request form. According to Wilson, this delay allowed the infection to worsen. Wilson testified that the second delay occurred on January 31, 2006. According to Wilson, the symptoms Muhammad observed at 2:30 a.m. should have led a reasonable medical practitioner in her position to conclude that plaintiff was suffering from an advanced infection and that he needed to be transported to the emergency room for immediate treatment. He also stated that the blindness would not have occurred had plaintiff been transported to OSUMC at 2:30 a.m. and the infection been aggressively treated at that time. According to Wilson, with the type of infection of which plaintiff was suffering, "every hour is important." Wilson testified that the delays in treatment were a breach of the standard of care and thus such breach was the proximate cause of plaintiff's injuries. Wilson speculated that if plaintiff had been seen by a doctor and prescribed antibiotics at the first sign of infection, approximately 48 hours after the tooth was extracted, the infection most likely would not have spread and plaintiff would not have lost sight in his left eye.

{¶ 11} Defendant offered the testimony of Theodore Herwig, M.D. Herwig had recently retired, but retained his board certification in family practice medicine. Herwig also reviewed plaintiff's medical records (Joint Exhibits A, B) and testified that defendant did not breach the applicable standard of care in its treatment of plaintiff. Specifically,

Herwig testified that inasmuch as the first indication in plaintiff's medical records that he was having complications from the tooth extraction was early in the morning on January 31, 2006, that Muhammad acted appropriately when she consulted the doctor and scheduled plaintiff for an appointment, and that the doctor properly ordered transport to OSUMC soon after examining him.

{¶ 12} Herwig further testified that "dry socket" infections are relatively common as a result of tooth extractions, but that it is rare for an infection to spread into the cavities of the face, as in plaintiff's case, and that he had not encountered such a case in the 50 years of his practice. Herwig stated that infections are "processes," not "events," and that it is a judgment call as to when an infection reaches a point that it is dangerous and should be treated aggressively. Herwig opined that in plaintiff's situation, Nurse Muhammad was not qualified to make that decision, and that she acted appropriately in contacting the doctor and scheduling an appointment. Herwig was also of the opinion that the care plaintiff received from defendant was more expedient than he would have received had he not been in prison.

{¶ 13} Defendant also offered the testimony of Ted Raybould, a Doctor of Dental Medicine.[2] Raybould is a professor in the University of Kentucky Department of Oral Health Sciences, serves as the chair of the Department of General Practice Dentistry, has been a licensed dentist in Kentucky since 1981, and participates daily in the clinical practice of dentistry. Raybould testified that he too reviewed plaintiff's records from OSUMC and PCI in preparation for trial. (Joint Exhibits A, B.) According to Raybould, the records show that: on January 25, 2006, plaintiff's #16 tooth, an upper left "wisdom" tooth, was extracted at PCI; plaintiff came to the PCI infirmary early on the morning of January 31, 2006 and was prescribed 800 milligrams of ibuprofen for pain; plaintiff returned to the PCI infirmary at 7:30 a.m. on January 31, 2006, with increased swelling and pain and was given additional ibuprofen and told to return at 12:30 p.m. to see the

doctor; he was transported to OSUMC later that day after being examined by the doctor; the infection in the left side of the mouth was surgically drained on the evening of January 31, 2006; the day after the surgery plaintiff began to experience pain behind his left eye that was determined to be a retrobulbar hemorrhage which resulted in plaintiff undergoing more surgeries and ultimately losing sight in his left eye.

{¶ 14} Raybould opined that the dental care provided to plaintiff complied with the accepted standard of care. Specifically, Raybould testified that there are no notations in the records that the tooth extraction was anything more than a routine procedure. Furthermore, Raybould stated that it is not uncommon for a patient to wait several hours to see a doctor when they present with symptoms similar to those plaintiff presented with at the PCI infirmary on the morning of January 31, 2006. He also testified that infection is an accepted risk associated with tooth extractions, that he has treated many such infections, and that in his 30 years as a dentist he is aware of only an "urban legend" from dental school involving a patient losing his sight as a result of such an infection. Raybould opined that transporting plaintiff to OSUMC earlier on January 31, 2006, would not have made a difference in plaintiff's outcome. Raybould further opined that the hemorrhage was caused by the initial surgery plaintiff underwent at OSUMC because plaintiff did not complain of any eye or vision problems until afterward.

{¶ 15} However, Raybould admitted that if plaintiff had been prescribed antibiotics a "few days" before he visited the infirmary on January 31, 2006, the infection may have been cleared up without surgery and plaintiff may not have lost sight in his left eye.

{¶ 16} With regard to the above-described alleged second "delay" in treatment, the court concludes that the evidence of events on January 31, 2006, does not establish an unreasonable delay in treatment which would constitute a breach of the standard of care. While Dr. Wilson testified that Nurse Muhammad should have recognized the signs of an infection at 2:30 a.m. on the date in question, testimony from Reeves-

---

[2]Raybould stated that a "DDM" in Kentucky is equivalent to a Doctor of Dental Surgery or "DDS" in Ohio.

Valentine and Dr. Herwig establish that she was not qualified to make that evaluation and was not authorized to order plaintiff transported to OSUMC for emergency care. Furthermore, based upon the testimony from Dr. Raybould and plaintiff's own testimony that he did not experience vision problems in his left eye until several days after the initial surgery at OSUMC, the court finds that plaintiff failed to establish that the infection was the proximate cause of the blindness in his left eye.

{¶ 17} Based upon the foregoing, the court finds that plaintiff has failed to carry his burden of proof by establishing that the alleged delays in the provision of medical treatment were a breach of the duty of care owed to plaintiff and that those delays were the proximate cause of his injuries. Accordingly, judgment is recommended in favor of defendant.

{¶ 18} *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

_____
MATTHEW C. RAMBO
Magistrate

cc:

Anne B. Strait                          Wm. Eric Minamyer
Assistant Attorney General              9832 Farmstead Drive
150 East Gay Street, 18th Floor    Loveland, Ohio 45140
Columbus, Ohio 43215-3130

MR/dms
Filed July 11, 2011
To S.C. reporter August 2, 2011